*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0190p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DEBRA ROGERS,

        *Plaintiff-Appellant,*

    *v.*

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant-Appellee.*

No. 05-4369

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-02550—George J. Limbert, Magistrate Judge.

Submitted: October 26, 2006

Decided and Filed: May 24, 2007

Before: MARTIN and COOK, Circuit Judges; BUNNING, District Judge.[*]

---

**COUNSEL**

**ON BRIEF:** Cherie H. Howard, NORTHEAST OHIO LEGAL SERVICES, Youngstown, Ohio, for Appellant. Lisa Hammond Johnson, UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

    DAVID L. BUNNING, District Judge. In this appeal, we are asked once again to consider the substantive and procedural requirements of the Social Security Act and the regulations of the Social Security Administration. Specifically, we must evaluate the Commissioner's decision denying disability benefits to a claimant who alleges she suffers from pain and other symptoms associated with fibromyalgia and rheumatoid arthritis. In doing so, we examine whether the Commissioner adequately reviewed the case record and did so using the correct legal standards, thereby resulting in substantial evidence to support the denial of benefits. For the following reasons, we hold that the Commissioner did not, and therefore reverse the judgment of the district court and remand this matter for further findings.

---

[*] The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. BACKGROUND

### A.     Factual Background

Plaintiff-Appellant Debra Rogers is presently 45 years of age, with a high school education. She alleges an inability to work since 1993 due to numerous health conditions. Her work history is not extensive. In the few years preceding her alleged disability onset she worked part-time, most recently at a restaurant performing food preparation, cleaning, and cashier work until pain in her neck, shoulders, back, joints, and extremities prompted her to leave that job in 1993. Relevant to this appeal, Rogers asserts that fibromyalgia and rheumatoid arthritis, and specifically the pain associated with these conditions, prevent her from engaging in substantial gainful employment.

Dr. Robert A. Evans, a doctor of osteopathic medicine and family practitioner, has been Rogers' treating physician since 1993, seeing her every six weeks on average since that time. In July of 1998, Dr. Evans submitted his first assessment of Rogers to the Bureau of Disability Determination, to which he attached office notes dating back to August, 1995. This report and attached notes reveal a long history of pain and other symptoms. Notably, Rogers complained of pain in her shoulders, thighs, ankles, abdomen, bones, arms, hips, and chest; of tingling in her fingers; and of tenderness in her wrists and arms. The notes also list several prescribed medications. In his report, Dr. Evans diagnosed, among other things, headaches, cervical disc disease, and rheumatoid arthritis, and indicated that standing, walking, sitting, bending, and lifting were all affected by these conditions. Dr. Evans opined that Rogers was capable of sedentary work only.

In March of 1999, Dr. Evans submitted a Medical Impairment Evaluation in which he listed arthralgia and depression as disabling conditions. This report stated that Rogers had experienced increased pain that interfered with her ability to engage in past employment and that her condition was "poor." He observed swelling and noted that Rogers was unable to grasp objects. Dr. Evans' assessment of Rogers' limitations was that she could lift only five pounds and could sit and stand for no more than one hour in an eight-hour workday.

In June of 1999, Dr. Evans submitted a medical report to the Ohio Department of Human Services in which he indicated Rogers suffers both from fibromyalgia and rheumatoid arthritis and listed no less than six medications prescribed to her. He then opined that these conditions limit her ability to perform certain basic functions. For example, he suggested that Rogers could stand for only one hour during an eight-hour period and only five minutes uninterrupted, that she could lift no more than five pounds, and that she was "markedly limited" in her ability to push and pull. Dr. Evans concluded at that time that Rogers was unemployable.

An additional report confirming these opinions was submitted on May 18, 2001. In that report, Dr. Evans stated that Rogers experiences tenderness to palpitation, decreased range of motion, and swelling of the joints. He noted that lab work indicated elevated sedimentation rates. Finally, he attested to Rogers' pain, attributing it to rheumatoid factors. In assessing Rogers' limitations, Dr. Evans suggested that she is unable to sit or walk for more than ten minutes continuously, and that she can neither sit nor stand for more than fifteen minutes total in an eight-hour workday. He also suggested that Rogers can lift five pounds only occasionally and that she is incapable of bending, squatting, crawling, or climbing.

Dr. Richard Stein is a rheumatologist who began treating Rogers in 1997. Dr. Stein noted on October 18, 1997, that rheumatoid arthritis was "likely" in light of Rogers' sedimentation rate, and that fibromyalgia "may be active." On December 3, 1997, Dr. Stein recorded that Rogers was then suffering severe hip pain, which, according to his notes, prohibited her from "do[ing] anything, even turning over in bed." Dr. Stein also noted that Rogers exhibited tender points of "classic fibromyalgia distribution." On January 14, 1998, Dr. Stein documented tenderness and swelling and

noted several medications. On May 20, 1998, Dr. Stein noted that Rogers was suffering from "pain all over" and that her "joints hurt everywhere." Additionally, he remarked that her tender points were very sensitive, and that her pain symptoms were more demonstrative of fibromyalgia than rheumatoid arthritis. Further tissue swelling and joint tenderness were observed. Dr. Stein's notes also indicated that Rogers needs a "very sedentary job, only answering phones because of her chronic pain." On August 20, 1998, Dr. Stein confirmed that Rogers' tender points were of a "classic fibromyalgia distribution." On examination of September 24, 1998, Dr. Stein noted that Rogers was experiencing chest and shoulder pain, as well as occasional tingling in the hands. Dr. Stein performed injections of lidocaine and marcaine for her shoulder pain with "marked" relief. On September 28, 1998, Dr. Stein submitted an assessment to the Bureau of Disability Determination (hereinafter "Bureau"). In his assessment, he diagnosed Rogers with rheumatoid arthritis and fibromyalgia and limited her lifting and carrying capacity to less than five pounds.

Notes of Dr. Stein from October 28, 1999, indicate that Rogers' pain persisted, that she was experiencing difficulty sleeping, and that she had tender points "too numerous to enumerate." According to his medical records, Rogers saw him four times in 2000. During her last visit on November 14, Dr. Stein documented "multiple tender spots consistent with fibromyalgia" as well as continued joint tenderness.

A similar pattern of findings was noted in Dr. Stein's 2001 and 2002 treatment notes. He completed a second assessment on May 14, 2001, concluding that Rogers suffers from rheumatoid arthritis and fibromyalgia. He further concluded she is limited to fifteen minutes of uninterrupted sitting, only five minutes of uninterrupted standing, can lift and carry ten pounds only occasionally, and can neither grasp nor push or pull objects.

Dr. Samuel Rosenberg is a pain specialist to whom Rogers was referred by Dr. Stein. Dr. Rosenberg examined Rogers and concluded that she suffers from rheumatoid arthritis, among other things. He recommended she receive a series of steroid injections to help ease her pain. These injections were noted in Dr. Stein's record of March 16, 1998, as well as the fact that she was "60% improved." Unfortunately, Rogers reported that her pain had returned during her May 20, 1998, visit with Dr. Stein.

Dr. Alan Oliver is a critical care specialist to whom Rogers was referred by Dr. Evans. Rogers saw Dr. Oliver on May 28, 1998. He diagnosed rheumatoid arthritis and cervical disc disease. He further confirmed that Rogers' ability to stand, walk, sit, lift, and carry were all affected by her conditions, noting that she is "poor but stable."

In July of 2002, Dr. Naomi Waldbaum, a physical medicine and rehabilitation specialist, performed an evaluation at the behest of the Bureau. Dr. Waldbaum noted tenderness and pain in Rogers' shoulders, elbows, hands, fingers, wrists, lower back, hips, thighs, knees, ankles, and feet. She further noted that Rogers reported feeling tired and very stiff, and that she experiences numbness and tingling sensations in her hands and legs. Dr. Waldbaum listed Rogers' then-current medications, including Propoxyphene, Sulfasalazine, Cyclobenzaprine, Estradiol, Celebrex, Ranitidine, Alprozolam, Methotrexate, and Folic Acid. Dr. Waldbaum recounted Rogers' daily activities as driving short distances, daily grooming, and some very simple tasks; however, these activities were qualified by the doctor's notation that Rogers' daughter lives next door and assists her.

Dr. Waldbaum's physical evaluation of Rogers revealed good ranges of motion and normal reflexes; however, she appeared to be very stiff as marked by complaints of significant pain. Dr. Waldbaum also considered Rogers' diagnoses of rheumatoid arthritis, noting that there were no blood tests or elevated sedimentation rates upon which to base such a diagnosis, and that x-rays and CT scans showed no abnormalities of the soft tissue. Dr. Waldbaum concluded that Rogers "states

that she was diagnosed with rheumatoid arthritis," that she exhibits significant pain behavior, and that she would be unable to maintain full-time employment.

Dr. David Rath, a non-examining physician who conducted a record review while Rogers' claim was before the state agency, submitted a physical residual functional capacity assessment in July of 1998. Dr. Rath concluded that Rogers suffers from fibromyalgia, which is consistent with her muscular aches, but that there are no signs of significant rheumatoid arthritis. Dr. Rath went on to note that Rogers' limitations appeared to be related to her subjective complaints of pain, but that no objective findings supported her complaints. He opined that she could frequently lift twenty-five pounds and occasionally lift fifty pounds; that she could stand and walk for six hours in an eight-hour workday; that she could sit for six hours in an eight-hour workday; that there were no limitations on her ability to push or pull; and that strenuous exercise should be limited.

In November of 1998 Dr. Gary DeMuth reviewed and confirmed Dr. Rath's RFC. Dr. Rath's RFC was again reviewed and confirmed in December of 1998 by Dr. Leonard Weinstein, the only change being Dr. Weinstein's notation of her musculoskeletal impairment as being moderately severe. The medical specializations for Drs. Rath, DeMuth, and Weinstein are not reflected in the case record.

## B.      Procedural Background

Rogers applied for Supplemental Security Income (hereinafter "SSI") on May 21, 1998. After her application was denied initially and on reconsideration, she requested a hearing before an administrative law judge (hereinafter "ALJ"). This first hearing was held on December 9, 1999. Rogers testified that she was previously employed as a restaurant worker, which required that she regularly lift between thirty and fifty pounds and remain on her feet. She further testified that she left this job because of stabbing pain from her neck down, coupled with numbness and tingling. Moreover, she stated that, but for her pain, she would have continued working. During her testimony, she identified ten medications she had been prescribed and was taking for her conditions. Rogers also reported that she had a difficult time lifting anything more that five pounds, and could no longer lift a gallon of milk. She reported occasional loss of sensation in her fingers, causing difficulty in dressing herself. She also reported that she no longer takes walks due to the pain she experiences in her hip and legs after walking a short distance. She claimed difficulty in bending over and standing in one place for more than a minute or two, although she admitted that she shopped for herself, did the laundry, maintained her rented room, prepared her own meals, and paid rent, but was no longer able to push the vacuum. She reported doing some gardening. She said she is no longer able to walk her dog and that, although she enjoys reading, she has a difficult time holding a book and could sit for only 15 to 20 minutes at a time. She further testified that her meals consist of quick, easy-to-prepare foods and that she typically does not shop alone, but is assisted by her son or a neighbor.

On January 28, 2000, ALJ Allan P. Ramsay, Jr. issued his written decision, finding that Rogers was not disabled within the meaning of the Social Security Act and therefore not entitled to SSI. Rogers sought review of the ALJ's decision by the Appeals Council. Her request for review was granted, with the ALJ's decision vacated and the matter remanded for further consideration.

A *de novo* hearing occurred on November 15, 2002. Rogers then testified that Vicodin and Morphine had since been added to her list of prescribed medications. She described experiencing severe pain in her head, shoulders, elbows, wrists, fingers, hips, knees, ankles, and feet, and of having significant stiffness and swelling. She further testified that she could lift only two or three pounds, with difficulty. Also, standing longer than thirty minutes was painful, as was walking. She testified she is limited in her ability to manipulate objects with her hands. As for daily routine, she said she showers, dries her hair, tends to her dog, prepares light meals, performs light dusting,

arranges her bed, and shops for groceries and clothing.  On pleasant days, she walks for at least a mile.

Dr. Moses Leeb, an orthopedic surgeon, was also present at this second hearing to offer expert medical opinion testimony.  He testified there was no evidence supporting rheumatoid arthritis except for a single lab study showing elevated sedimentation rates.  He based his opinion on the results of several x-rays and CT scans reported as normal.  He also noted that Dr. Stein's "prism operating diagnosis" was fibromyalgia and that the best treatment for such condition is to encourage participation in regular exercise such as walking and stretching. Elaborating on the rheumatoid arthritis, Dr. Leeb noted that elevated sedimentation levels were not specific to rheumatoid arthritis, and that no definitive lab studies had confirmed the condition.  Dr. Leeb testified that none of Rogers' impairments met the listings in the Social Security regulations.  He opined that, based solely upon the objective findings, she would be subject to very few limitations, but would be limited to sedentary work if her subjective complaints were credited.

On November 26, 2003, ALJ Ramsay issued his written decision, again determining that Rogers was not disabled under the Act.  On January 8, 2004, Rogers sought review by the Appeals Council. Her request was denied on November 19, 2004, and thus the ALJ's determination became the final decision of the Commissioner.  She appealed the decision to the United States District Court for the Northern District of Ohio.  The presiding Magistrate Judge entered an August 30, 2005, Memorandum and Opinion and Judgment affirming the Commissioner's decision.  Rogers appeals that decision to this court.

## II.  ANALYSIS

### A.     Standard of Review and Legal Framework

In Social Security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Act and therefore entitled to benefits.  42 U.S.C. § 405(h).  This court's review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards.  42 U.S.C. § 405(g); *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).

Following remand of Rogers' claim by the Appeals Council and *de novo* hearing, the ALJ employed the governing five-step sequential analysis.  20 C.F.R. § 416.920.  Specifically, at step one he found that Rogers had not engaged in substantial gainful activity since her alleged date of onset.  *See* 20 C.F.R. §§ 416.920(a)(4)(I) and 416.920(b).  At step two, he found that Rogers has severe multiple arthralgias and degenerative cervical and lumbosacral disc disease with mild spondylosis at the L5-S1 level, *see* 20 C.F.R. §§ 416.920(a)(4)(ii) and 416.920(c), but that her impairments did not meet any of the listings found in Appendix 1 of the regulations, *see* 20 C.F.R. §§ 416.920(a)(4)(iii) and 416.920(d).  In determining Rogers' residual functional capacity (hereinafter "RFC"), the ALJ concluded that her statements about her pain and limitations were not fully credible and that she retained the ability to perform a limited range of work at the medium level of exertion.  Finally, the ALJ found that because Rogers' past relevant work as a kitchen helper as performed by her fell within her RFC, she therefore was not disabled for Social Security purposes. *See* 20 C.F.R. §§ 416.920(a)(4)(iv) and 416.920(f).  Since the ALJ's evaluation ended at step four, he did not consider the fifth and final step of the sequence; that is, whether other jobs in significant

numbers exist in the national economy that Rogers could perform given her RFC and considering relevant vocational factors.  *See* 20 C.F.R. §§ 416.920(a)(4)(v) and 416.920(g).

In this appeal, Rogers argues that the ALJ refused to recognize her fibromyalgia and rheumatoid arthritis as severe, disabling impairments within the meaning of the Social Security Act. The ALJ's rejection of these conditions as impairments, argues Rogers, necessitated he improperly weigh the treating physician evidence and discount her own testimony. The Commissioner responds that the ALJ's decision that Rogers can perform her past relevant work is supported by substantial evidence and that she is, therefore, not disabled.

### B.          The ALJ Failed to Properly Evaluate the Medical Opinion Evidence

In assessing the medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere.  Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule.[1] *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).  Because treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians.  20 C.F.R. § 416.927(d)(2).  Therefore, if the opinion of the treating physician as to the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," then it will be accorded controlling weight. *Wilson*, 378 F.3d at 544.  When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id*.  However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding.  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

There is an additional procedural requirement associated with the treating physician rule.  Specifically, the ALJ must provide "good reasons" for discounting treating physicians' opinions, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. at *5.  The purpose of this procedural aspect of the treating physician rule is two-fold.  First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson*, 378 F.3d at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*  Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon

---

[1] Defendant has not contested that Drs. Stein, Evans, and Rosenberg are Plaintiff's treating physicians, as so defined in 20 C.F.R. § 416.902.

the record. *Id*. With these standards in mind, the court turns to the ALJ's consideration of the medical evidence in the present case.

### 1.          Fibromyalgia

The Commissioner found Rogers to have severe impairments of "multiple arthralgias and degenerative cervical and lumbosacral disc disease, with mild spondylosis at the L5-S1 level." While noting that Rogers has been diagnosed with fibromyalgia, the ALJ's decision reflects some hesitancy in identifying this accepted medical condition as a severe impairment,[2] and this hesitancy, in turn, influenced the ALJ's weighing of the treating physician evidence.

On at least one occasion, we have recognized that fibromyalgia[3] can be a severe impairment and that, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *See Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia); *see also Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain"). Rather, fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston*, 854 F.2d at 820. The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.*; *Swain*, 297 F. Supp. 2d at 990.

The claimant in *Preston* complained of pain, stiffness, and fatigue. *Preston*, 854 F.2d at 820. Her treating physician determined that she suffered from fibromyalgia, a determination based upon observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and "systematic" elimination of other diagnoses. *Id.* The ALJ, however, determined that the claimant did not suffer from the condition based primarily upon objective evidence introduced by the Commissioner demonstrating "fairly normal clinical and test results." *Id.* at 819-20. A panel of this court reversed the decision on grounds that it was not based upon substantial evidence, noting that "CT scans, X-rays, and minor abnormalities, noted by these doctors and cited by the Secretary

---

[2] To determine that a claimant has a severe impairment, the ALJ must find that an impairment or combination of impairments significantly limits the claimant's ability to do basic work activity. 20 C.F.R. § 416.920. An "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [claimant's] statement of symptoms." 20 C.F.R. § 416.908. Step two has been described as a "*de minimus* hurdle"; that is, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir. 1988).

[3] Fibromyalgia, also referred to as fibrositis, is a medical condition marked by "chronic diffuse widespread aching and stiffness of muscles and soft tissues." *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005). We note also that ours is not the only circuit to recognize the medical diagnosis of fibromyalgia as well as the difficulties associated with this diagnosis and the treatment for this condition. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (noting that fibromyalgia's "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective"); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) (noting that "a growing number of courts . . . have recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease") (internal quotation marks and citations omitted); *Welch v. Unum Life Ins. Co. of Am.*, 382 F.3d 1078, 1087 (10th Cir. 2004) ("'Because proving the disease is difficult . . . , fibromyalgia presents a conundrum for insurers and courts evaluating disability claims.'") (*quoting Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1067 (9th Cir. 1999)).

as substantial evidence of no disability . . . are not highly relevant in diagnosing [fibromyalgia] or its severity." *Id.* at 820.

As in *Preston*, the ALJ's decision here impliedly dismissing or minimalizing Rogers' fibromyalgia and instead accepting the non-treating doctors' opinions as to her limitations from "arthralgias" was not based upon substantial evidence. As noted, the process for diagnosing fibromyalgia involves testing for tenderness in focal points and ruling out other conditions. *Id.*; *Swain*, 297 F. Supp. 2d at 990. The ALJ did not discuss this standard at all in his decision, nor is this standard provided by *Preston* discussed in the Commissioner's brief on appeal. The medical evidence submitted by Rogers' treating physicians, particularly Dr. Stein, is replete with references to observed tender points in the "classic fibromyalgia distribution." In addition, Drs. Stein and Evans recorded ongoing complaints of intense pain and stiffness throughout Rogers' body, as well as fatigue. Finally, Dr. Stein's notes for his course of treatment evidence a process of diagnoses elimination, as he sought to determine whether Rogers' symptoms resulted from fibromyalgia and/or rheumatoid arthritis. Again, this was neither acknowledged nor discussed by the ALJ.

Other factors tend to support affording the opinions of Rogers' treating physicians' significant weight. Dr. Evans began treating Rogers in 1993, and Dr. Stein first began treating her in 1997. Combined, these physicians have been treating Rogers for more than twenty years. Further, the more than 500 pages of medical evidence in this case reflect continuous and frequent treatment by both physicians. Their documentation consistently demonstrates treatment for the same symptoms; namely, pain and stiffness, symptoms that according to these same documents have progressively increased in severity. Drs. Evans and Stein reached similar diagnoses, prescribed similar medications, and suggested similar limitations with respect to Rogers' ability to perform basic functions.

Moreover, the medical opinions reflected in both physicians' medical records and reports are credible in light of medically acceptable practices. Although fibromyalgia is not susceptible of objective verification through traditional means, Dr. Stein's records in particular reflect that he continually tested for and Rogers increasingly exhibited the medically-accepted and recognized signs of fibromyalgia. Specifically, he noted on numerous occasions that she complained of tenderness in the appropriate focal points. Finally, unlike the non-treating physicians upon whose testimony and reports the ALJ placed great emphasis, Dr. Stein is a rheumatologist, and thus a specialist in the particular types of conditions Rogers claims to suffer from.

Despite this evidence, the ALJ disagreed with the opinions of Drs. Evans and Stein and, more critically, failed to provide an analysis of the factors to be considered in determining the weight accorded the opinions of Rogers' treating physicians. Instead, the ALJ focused on the testimony of Dr. Leeb and the limitations opined by Dr. Rath. Neither Dr. Leeb nor Dr. Rath are treating physicians, a fact of special significance given the unique nature of fibromyalgia. Nor did either of them perform a physical examination of Rogers. Indeed, the agency expert who did perform a physical exam, Dr. Naomi Waldbaum, noted that Rogers exhibits significant pain behavior and would be unable to maintain full-time employment.

Although Dr. Rath's specialization is not indicated in the record, Dr. Leeb's specialization is orthopedic surgery. At hearing, Dr. Leeb shared that he had never had occasion to treat a patient diagnosed with fibromyalgia. Furthermore, it appears as though a significant amount of time has passed, at least some six years, between Dr. Rath's review of Rogers' medical history in 1998 and

the ALJ's decision. Dr. Rath therefore offered medical opinions without the benefit of observing later symptoms or reviewing subsequent treatment notes of Drs. Evans or Stein.[4]

Most importantly, it is clear that the opinions offered by Drs. Leeb and Rath were concerned solely with objective medical evidence. Dr. Leeb testified that "objectively" he found no evidence that Rogers had a severe physical impairment. He also testified that if Rogers' subjective complaints were considered, she would likely be limited to essentially sedentary work. But based on "pure objective findings," Dr. Leeb opined that Rogers has very few limitations. The physical limitations assessed by Dr. Rath were very similar to those ultimately found by the ALJ in determining Rogers' RFC. Although Dr. Rath acknowledged that Rogers has fibromyalgia, the limitations he suggested were based upon the lack of objective findings. Thus, the foundation for the opinions offered by Drs. Leeb and Rath was the lack of objective findings. However, in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant. *See Preston*, 854 F.2d at 820.

As for the "good reasons" given by the ALJ for rejecting Dr. Stein's opinions, the required explanation is even more deficient. The ALJ noted only that "[o]nce again, in assessing the evidence in light of Section 404.1527 of the Social Security Administration Regulations No. 4, the record does not support the limitations of the severity suggested by Dr. Stein." This explanation simply does not satisfy the notice requirement discussed in Social Security Ruling 96-7p and reaffirmed by this Court in *Wilson*. This required explanation, or the lack thereof in this particular case, is directed to explaining not just why these opinions do not warrant controlling weight, but should also explain what weight was given the treating opinions. No such evaluation was conducted by the ALJ here or, if it was, it is not articulated in the written decision. Because the ALJ failed to provide sufficient justification for the weight given to the opinions of Rogers' treating physicians, his decision in this regard did not meet the requirements of 20 C.F.R. § 416.927, and therefore cannot serve as substantial evidence. *See Wilson,* 378 F.3d at 544.

### 2.        Rheumatoid Arthritis

The ALJ also found that Rogers does not suffer from rheumatoid arthritis. Although significantly more of the administrative decision was addressed to the absence of rheumatoid arthritis than was dedicated to a discussion of fibromyalgia, we again conclude that the decision on this point lacked the critical analysis necessary to meet the substantial evidence standard.

No fewer than four physicians, including three treating physicians, have diagnosed Rogers with rheumatoid arthritis. Drs. Stein and Evans based their diagnoses on a lab test showing an elevated sedimentation rate, a finding consistent with rheumatoid arthritis. Moreover, both doctors' progress notes demonstrate a history of joint swelling and pain, as well as extensive use of medications. Dr. Rosenberg likewise diagnosed Rogers with rheumatoid arthritis and treated her with a series of steroid injections to assist with her pain. Finally, Dr. Oliver was the fourth physician to diagnose Rogers with rheumatoid arthritis. When the record as a whole is considered, the

---

[4] The importance of a non-examining source having a complete medical snapshot when reviewing a claimant's file was emphasized in a 1996 Ruling of the Social Security Administration:

> In appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources . . . if the State agency medical . . . consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996), Policy Interpretation Ruling Titles II and XVI: Consideration of Administrative Findings of Fact by a State Agency Medical or Psychological Consultants and other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Level of Administrative Review; Medical Equivalence.

evidence offered by the ALJ in support of his finding that Rogers does not have active rheumatoid arthritis is not substantial.

Again, rather than deferring to the medical opinions of Rogers' treating physicians, the ALJ relied upon the testimony of non-treating physician Dr. Leeb. He opined that "there were no definitive laboratory studies confirming a diagnosis of rheumatoid arthritis" and that the "rheumatoid factor was very questionable." On appeal, the Commissioner points to Dr. Leeb's testimony that the objective evidence, including the x-ray and sedimentation reports, in conjunction with the clinical tests, demonstrated normal findings; that at least one other physician observed normal ranges of motion; and that Rogers' joint swelling was not consistent with rheumatoid arthritis. However, even if we were to assume *arguendo* that Dr. Leeb's testimony casts a sufficiently doubtful shadow over the diagnoses of Rogers' treating physicians, the ALJ failed to explain in any illuminating way why he elected to elevate the opinion of a single non-treating non-examining orthopedic surgeon over four conflicting opinions, three of which belonged to Rogers' treating physicians, one of whom is a rheumatologist. Because this explanation by the ALJ is lacking, his rejection of rheumatoid arthritis as a severe impairment does not meet the substantial evidence standard.

### C.      The ALJ Failed to Properly Evaluate Rogers' Credibility

In evaluating Rogers' subjective complaints, the ALJ determined that her testimony was not fully credible. Specifically, the ALJ was persuaded by the absence of objective medical evidence supporting her symptoms, Rogers' own testimony regarding her daily activities, and testimony by Dr. Leeb that the best treatment for fibromyalgia patients is to exercise regularly. Whether the ALJ permissibly found Rogers' complaints not credible depends not only upon the scope of his authority in making such credibility determinations, but also upon his evaluation of the evidence on which the determinations were made.

In many disability cases, the cause of the disability is not necessarily the underlying condition itself, but rather the symptoms associated with the condition. 20 C.F.R. § 416.929; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 686 (6th Cir. 1992) (noting that "this court has previously held that subjective complaints of pain may support a claim for disability"). Claims based upon fibromyalgia are of this type as the complaints of pain, stiffness, and fatigue associated with the condition are the source of the alleged disability.

Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.* Relevant factors for the ALJ to consider in his evaluation of symptoms include the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms, such as lying on one's back; and any other factors bearing on the limitations of the claimant to perform basic functions. *Id.*; *see also* Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *2-3 (July 2, 1996) (Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements).

It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th

Cir. 1997); *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. Consistency of the various pieces of information contained in the record should be scrutinized. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

Social Security Ruling 96-7p also requires the ALJ explain his credibility determinations in his decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[5] In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. And given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important. *Hurst v. Sec'y of Health & Human Servs.,* 753 F.2d 517, 519 (6th Cir. 1985).

In the present case, the ALJ's consideration of Rogers' subjective pain complaints and assessment of her credibility do not comport with the Administration's requirements. The ALJ provides three reasons for his finding that Rogers' complaints and alleged limitations are not credible. First, he points out the lack of "objective" medical evidence and that she exhibited "normal reflexes" and "normal sensory testing." But as previously discussed, the nature of fibromyalgia itself renders such a brief analysis and over-emphasis upon objective findings inappropriate. *See Canfield v. Comm'r of Soc. Sec.,* No. CIV.A.01-CV-73472-DT, 2002 WL 31235758, at *1 (E.D. Mich. Sept. 13, 2002) (it would be "nonsensical to discount a fibromyalgia claimant's subjective complaints of pain based upon lack of objective medical evidence, as such evidence is generally lacking with fibromyalgia patients"). By focusing on purely objective evidence, the ALJ failed to discuss or consider the lengthy and frequent course of medical treatment or the nature and extent of that treatment, the numerous medications Rogers has been prescribed, the reasons for which they were prescribed, or the side effects Rogers testified she experiences from those medications.

Second, the ALJ emphasized that Rogers is "fairly active" by noting that she is still able to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news, "[d]espite her numerous complaints." Yet these somewhat minimal daily functions are

---

[5] The requirement that the Commissioner fully explain his determinations of the claimant's credibility is grounded, at least in part, upon the need for clarity in later proceedings. In *Hurst v. Sec'y of Health & Human Servs.*, a panel of this Court noted:

> In the absence of an explicit and reasoned rejection of an entire line of evidence, the remaining evidence is "substantial" only when considered in isolation. It is more than merely "helpful" for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.

753 F.2d 517, 519 (6th Cir. 1985) (*quoting Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

not comparable to typical work activities.[6]   Moreover, the ALJ's description not only mischaracterizes Rogers' testimony regarding the scope of her daily activities, but also fails to examine the physical effects coextensive with their performance. Specifically, Rogers indicated that she does very little driving due to her inability to sit for longer than a few minutes; that she engages in light housekeeping only; that the extent of her care for her dog includes opening the door to let him out in the morning; that she likes to read but has difficulty holding a book; that fixing meals usually means a sandwich or cereal; and that buttoning her shirt is difficult due to the numbness in her fingers.  The ALJ likewise failed to note or comment upon the fact that Rogers receives assistance for many everyday activities and even personal care from her children, who live close by.

Finally, in discrediting Rogers' testimony, the ALJ placed significance upon Dr. Leeb's testimony that the best treatment for fibromyalgia is regular exercise, including walking and stretching.  Of course, the fact that a patient is encouraged to remain active does not reflect the manner in which such activities may aggravate the patient's symptoms. Notably, Rogers' own treating physicians also recommended that she remain as active as possible, yet this did not alter their opinions as to her functional limitations and work restrictions.

In sum, while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence.  The decision in this case fails to "contain specific reasons for the finding on credibility, supported by the evidence in the case record," nor is it "sufficiently specific to make clear to the individual and to any subsequent reviews the weight the adjudicator gave to [Rogers'] statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4; *see also Tuohy v. Sec'y of Health & Human Servs.,* 34 F.3d 1068, 1994 WL 454880, at *5 & n.4 (6th Cir. 1994) (unpublished table decision) (noting Commissioner erred where there was little if any evidence contradicting treating physicians' opinions, other than Commissioner's personal opinion); *McBryde v. Sec'y of Health & Human Servs.,* 958 F.2d 371, 1992 WL 56755, at *2 (6th Cir. 1992) (unpublished table decision) ("While the Commissioner is best placed to determine matters of credibility, the Commissioner may not arbitrarily reject the testimony of the scientific experts in the case on the ground that his own personal opinion leads to a contrary result.").

### III.  CONCLUSION

In conclusion, the standards applied by the ALJ prevent this court from finding that the Commissioner's decision is supported by substantial evidence.  These standards, although quite deferential to the findings of the Commissioner, do have certain limitations.  Chief among them is the requirement that all determinations be made based upon the record in its entirety. *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).  This requirement that determinations be made in light of the record as a whole helps to ensure that the focus in evaluating an application does not unduly concentrate on one single aspect of the claimant's history, if that one aspect does not reasonably portray the reality of the claimant's circumstances. Specifically, we find that the reasons given for discounting the opinions of Rogers' treating physicians and for finding her subjective complaints not credible were insufficient to constitute substantial evidence. Accordingly,  since the ALJ's assessment of Rogers' residual functional capacity is driven by this consideration of "all of the relevant medical and other evidence," 20 C.F.R. § 416.945(a)(3), his RFC finding and its use in concluding Rogers could return to her past relevant work are similarly flawed.

---

[6] Typical or basic work activities refer to "the abilities and aptitudes necessary to do most jobs," including among other things "walking, standing, sitting, lifting, pushing, pulling, reaching carrying, or handling." 20 C.F.R. § 416.921(b).

However, we do not decide today whether there is substantial evidence in this record upon which to award benefits. That task, of course, is reserved first for the Commissioner in his discretion. Rather, we hold only that the Commissioner failed to provide sufficient justification for his denial based upon the applicable legal standards. We therefore **reverse** the judgment of the district court upholding the Commissioner's decision and **remand** with directions to return the claim to the Commissioner for further proceedings consistent with this opinion.